Kevin F. McCoy
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
601 West Fifth Avenue, Suite 800
Anchorage, Alaska  99501
(907) 646-3400

Attorney for Defendant

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>NOPENONE DENNIS SHINE,<br><br>Defendant. | Case No. 3:06-cr-0041-02-RRB<br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE DERIVED FROM THE WARRANTLESS SEARCH OF CELL PHONE DATA MAINTAINED ON BEHALF OF NOPENONE DENNIS SHINE** |

**I.    Introduction.**

This motion and memorandum have been prepared in advance of the requested evidentiary hearing. The factual representations contained in this memorandum are taken from materials provided by the government pursuant to Fed. R. Crim. P. 12(b) and 16.

**II.    Statement of Facts And Relief Sought.**

In the present case, the government used grand jury subpoenas to gather information from Alaska Communications System ("ACS") and from other cellular telephone providers for the purpose of transforming Mr. Shine's cellular telephone from a communication device into a tracking

device. The government expects to introduce this evidence in its case-in-chief to prove Mr. Shine's involvement in the charged conspiracies.

This motion seeks suppression of all evidence derived from the warrantless seizure of cellular telephone data maintained by any cellular telephone carrier, including ACS, which identify the location of the person using cellular telephone number (907) 240-3314 as calls were made to and made from it.

### III. Charging History.

#### A. The first indictment.

On April 19, 2006, the grand jury returned a true bill to a 142-count indictment. *See* Docket No. 2. The indictment charged Nopenone Dennis Shine and five others with conspiracy to import marijuana from Canada into Alaska (Count 1);[1] with conspiracy to possess with intent to distribute 1,000 kilograms or more of marijuana in Alaska (Count 2);[2] with 134 counts of money laundering;[3] with four counts of international money laundering;[4] with one criminal forfeiture count related to the drug offenses (Count 141);[5] and with one count of forfeiture related to money laundering (Count 142).[6]

---

[1] 21 U.S.C. §§ 963, 952, and 960(a) and (b)(I), (b)(3).

[2] 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A).

[3] 18 U.S.C. §§ 1956(a)(1)(A)(I), (a)(1)(B)(I), (a)(1)(B)(ii) and 2.

[4] 18 U.S.C. §§ 1956(a)(2)(B)(I) and 2.

[5] 21 U.S.C. §§ 853(a)(1) and (a)(2).

[6] 18 U.S.C. § 982(a)(1).

Mr. Shine was named only in Counts 1, 2, and 141.

**B.    The first superceding indictment.**

On June 21, 2006, the grand jury returned a true bill to a 145-count superceding indictment. *See* Docket No. 131. The first superceding indictment was substantially the same as the original indictment, except that it added nine (9) new co-defendants. Regardless, the charges against Mr. Shine in the superceding indictment remained precisely the same as those contained in the original indictment.

**C.    The second superceding indictment.**

On December 14, 2006, the grand jury returned a second superceding indictment, containing 142 counts. *See* Docket No. 284. The second superceding indictment added two new co-defendants, and essentially tracked the first two indictments and the charges against Mr. Shine remained the same. This time, however, the precise allegations against Mr. Shine changed dramatically. In particular, the second superceding indictment alleged for the first time that Mr. Shine and Thomas Ranes shot and killed Thomas Cody.

Significantly, Mr. Shine and Mr. Ranes are not charged with killing Cody in violation of 18 U.S.C. § 924(j), or in violation of any other federal statute. Instead, the murder charge is contained in a series of overt acts alleged in connection with the conspiracy to import marijuana (Count 1) and the conspiracy to possess with intent to distribute marijuana (Count 2). *See* Docket No. 284, OA 16 - 16d.

Discovery supplied by the government since return of the second superceding indictment demonstrates that it will attempt to prove the nascent murder charge in part with records

obtained without a warrant from cellular telephone service providers. These records have the effect of transforming Mr. Shine's cellular telephone from a communications device into a tracking device.

## IV. Technical Background.

### A. Cellular telephones are ubiquitous.

The use of cellular telephones in the United States is ubiquitous. The steadily increasing use of cellular telephones can be illustrated in any number of ways. For example, today the United States District Court for the District of Alaska now warns all attorneys to turn off cellular telephones before court hearings on pain of confiscation. In 2005, 69 percent of American adults reportedly owned and regularly used cellular telephones.[7] Cellular telephones are now everywhere, and it is reasonable to conclude that cellular telephone usage will continue to grow.

### B. The government can now transform cellular telephones into tracking devices.

Less commonly known is the ability of law enforcement, with the assistance of cellular telephone service providers, to use cellular telephones as tracking devices. Data mined from cellular telephone service providers can turn cellular telephones into real-time tracking devices, as well as historical tracking devices.[8] The technology used to track the movements of cellular

---

[7] www.infoworld.com/article/06/04/07/77227_HNcellphonerecord_1.html.

[8] The distinction between real-time tracking devices and historical tracking devices has been described as follows:

> "Real time" cell site information refers to data used by the government to identify the location of a phone at the present moment. Real-time cell site information is a subset of "prospective" cell site information, which refers to cell site information that is generated after the government has received permission to acquire it. Records stored by the wireless service provider that detail the location of a cell

telephone users has been explained by a number of District Courts. Illustrative is the description contained in *In Re Application For Order Of A Pen Register*, 402 F. Supp. 2d 597, 599 (D. Md. 2005).

> When powered on, a cellular telephone automatically communicates with one or more cell sites, also known as cell towers. The phone constantly seeks the cell site that provides the best reception, re-scanning for cell sites every seven seconds or when the signal strength weakens, regardless of whether a call is made. As the phone changes location, it automatically switches to the cell site that provides the best reception. Wireless service providers typically keep track of the identity of cell towers serving a phone at any point in time and the aspect of each tower facing the phone. When a phone is in touch with more than one tower, the service provider (or law enforcement, if given permission) can compare signals and locate the phone through a process of triangulation.
>
> In this fashion, a person's cellular telephone can be transformed into a tracking device capable of establishing the current location of the phone and its possessor, as well as the past locations of the phone and its possessor.

As earlier indicated, this motion seeks suppression of all evidence derived from the warrantless seizure of cellular telephone data maintained by any cellular telephone carrier, including ACS, which identify the location of the person using cellular telephone number (907) 240-3314 as calls were made to and made from it.

---

phone in the past (i.e., prior to entry of the court order authorizing government acquisition) are known as "historical" cell site information.

*In Re Application for Order of A Pen Register*, 402 F. Supp. 2d 597, 599 (D. Md. 2005).

V.  **Argument.**

  A. **Mr. Shine's expectation that his cell phone would not be used as a tracking device was reasonable.**

It is axiomatic that the Fourth Amendment protects people, not places. *Katz v. United States*, 389 U.S. 347, 351 (1967). *Katz* established a two-part inquiry. First, has an individual manifested a subjective expectation of privacy in the object of the search? Second, is society willing to recognize that expectation as reasonable? *California v. Ciraolo*, 476 U.S. 207, 211 (1986).

Mr. Shine respectfully contends that the warrantless, non-consensual seizure of his cellular telephone records for the purpose of converting his cellular telephone into a tracking device, capable of revealing his location 24 hours a day, violated the Fourth Amendment. Mr. Shine's expectation that his cell phone would not be used as a tracking device was reasonable. Commentators readily endorse the reasonableness of Mr. Shine's expectation.

> Though society no doubt recognizes the need for law enforcement agencies to conduct efficient surveillance and investigations, that does not necessarily mean that people expect their locations and movements to be monitored via cell technology. . . . [S]ervice carriers can determine this information with surprising ease whenever cell phones are turned on – even if users switch GPS functions to emergency-only mode. Given current database and storage capacities, the door is open for an Orwellian scenario whereby law enforcement agents could monitor not just criminals, but anyone with a cell phone. If it sounds improbable, consider that commercial tracking services already provide real-time location information for families and businesses. On-line services like uLocate allow users to "[v]iew the locations of family members on the website or your phone," "[r]eview all the locations visited during a specified time frame," "[p]ermit [others] to view your location on a temporary basis," and "[b]e alerted when individuals arrive or depart from specified locations." While society may be willing to accept the idea of collecting information associated with the origination and

> termination of calls, people are likely to reject the prospect of turning every cell phone into a tracking device.

Note, WHO KNOWS WHERE YOU'VE BEEN? PRIVACY CONCERNS REGARDING THE USE OF CELLULAR PHONES AS PERSONAL LOCATORS, 118 Harv. J. L. & Tech. 307, 316 (2004). *See also* Susan W. Brenner and Leo L. Clark, FOURTH AMENDMENT PROTECTION FOR SHARED PRIVACY RIGHTS IN STORED TRANSACTIONAL DATA, 14 J. L. & Pol'y, 211 (2006).

### B. District courts have repeatedly refused to compel disclosure of real-time cell site information for tracking purposes without a warrant.

Not surprisingly, the implications of cellular telephones as tracking devices have not been lost on law enforcement. Increasingly, prosecutors and law enforcement officers have been asking courts for authorization to track persons using cellular telephones to pinpoint their locations, because such evidence could be relevant to ongoing criminal investigations. However, district courts have repeatedly rejected such applications when the applications fail to meet threshold Fourth Amendment probable cause requirements.

Illustrative is *In Re Application For Order Of A Pen Register*, 402 F. Supp. 2d 597 (D. Md. 2005). In that case, the government sought permission to use cellular telephone technology to transform cellular telephones into real-time tracking devices pursuant to 18 U.S.C. § 3121 *et seq.* (the Pen/Trap Statute) and 18 U.S.C. § 2701 *et seq.* (the Stored Communications Act). The court rejected the application, in part because it circumvented the Fourth Amendment probable cause requirement. *Id.* at 598.

> The Fourth Amendment applies when (1) an individual has exhibited an actual (subjective) expectation of privacy and (2) the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable. Contrary to the government's suggestion, I do not believe most cell phone possessors realize they

>can be located within 100 - 300 meters any time their cell phone is turned on. Moreover, cell phone possessors' expectation of privacy, at least when they are in a non-public place, seems altogether reasonable. Those who choose to carry a cell phone, which has been turned on, cannot reasonably be deemed to have consented to the tracking of their movement by the government.

*Id.* at 605, n.12.

Other courts confronting comparable applications under 18 U.S.C. § 3121 *et seq.* (the Pen/Trap Statute), 18 U.S.C. § 2701 *et seq.* (the Stored Communications Act), and 47 U.S.C. § 1001 *et seq.* (Communications Assistance for Law Enforcement Act) have reached the same result. *See, e.g., In Re Application of the United States of America for Orders Authorizing the Installation and Use of Pen Registers and Caller Identification Devices on Tel. No. [Sealed] and [Sealed]*, 416 F. Supp. 2d 390 (D. Md. 2006) (warrant required for seizure of real-time cell site information); *In Re Application of the United States of America for an Order Authorizing the Installation and Use of a Pen Register and/or Trap and Trace for Mobile Identification No. (583) 111-1111 and the Disclosure of Subscriber and Activity Info. Under 18 U.S.C. § 2703*, 415 F. Supp. 2d 211 (W.D.N.Y. 2006) (government was not entitled to order compelling cellular telephone company to provide real-time cell site data for particular phone, on less than probable cause); *In the Matter of the Application of the United States of America for an Order Authorizing the Installation and Use of Prospective Cell Site Info.*, 407 F. Supp. 2d 132 (D.D.C. 2005) (same); *In the Matter of the Application of the United States of America for an Order (1) Authorizing the Installation and Use of a Pen Register and Trap and Trace Device and (2) Authorizing Release of Subscriber Info. and/or Cell Site Info.*, 396 F. Supp. 2d 294 (E.D.N.Y. 2005) (same); *In Re Application for Pen Register and*

*Trap/Trace Device with Cell Site Location and Auth.*, 396 F. Supp. 2d 747 (S.D. Tex. 2005) (warrant required to obtain real cell site information for purposes of revealing users location).

These authorities unequivocally establish that Mr. Shine had an expectation of privacy that his cellular telephone would not be used to determine his location 24 hours a day, either prospectively or in the past. These authorities also solidly demonstrate that Mr. Shine's expectation is one the community as a whole is prepared to accept as reasonable.

    **C.**    **New technologies for surveillance do not supplant reasonable expectations of privacy when those capabilities are unknown to cellular telephone subscribers.**

The question presented by this motion is whether evolving technology erodes otherwise reasonable expectations of privacy. As technology advances, courts have readily discarded outmoded concepts of Fourth Amendment analysis. *See and compare Olmstead v. United States*, 277 U.S. 438 (1928) (wiretap of defendant's home telephone effectuated without a physical trespass did not violate the Fourth Amendment), with *Katz v. United States*, 389 U.S. 347 (1967) (rejecting the Fourth Amendment trespass construct as archaic because the Fourth Amendment protects people, not places). *See also Kyllo v. United States*, 533 U.S. 27, 34 (2001) (holding that thermal imaging of a home constitutes a search because "[i]t would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by technology.").

In *United States v. Knotts*, 460 U.S. 276 (1983), the defendant challenged the use of a device inserted by law enforcement into a barrel of chloroform for the purpose of tracking chemicals used in a drug manufacturing operation. The *Knotts* court found no Fourth Amendment violation. It reasoned that the tracking device only supplemented what law enforcement could

readily have observed visually by actually following the defendant as he traveled on public highways. In the process, the court rejected Mr. Knotts' "Big Brother"[9] concerns with the following caveat.

> [Knotts] expresses the generalized view that the result of the holding . . . would be that twenty-four hour surveillance of any citizen . . . [would] be possible, without judicial knowledge or supervision. But the fact is that the "reality hardly suggests abuse," *Zurcher v. Stanford Daily*. 436 U.S. 547, 566, 987 S. Ct. 1970, 1982, 56 L. Ed. 2d 525 (1978); if such dragnet-type law enforcement practices as respondent envisions should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable.

Warrantless seizures of cellular telephone records for the purpose of tracking the movement of citizens now presents the dragnet-type law enforcement practices the court identified and feared by Mr. Knotts. The government now has the technological ability, with assistance from cellular telephone service providers, to track the whereabouts of all citizens using cellular telephones, 24 hours a day, both prospectively and historically. Mr. Shine readily recognizes that in 1979, well before the advent of cellular telephone technology, the Supreme Court held that a person does not have a reasonable expectation of privacy in the numbers he or she dials. When using a telephone, the person "assumed the risk" that the dialed number could be provided to third parties. *Smith v. Maryland*, 442 U.S. 735, 742-44 (1979).

The same cannot be said in the cellular age, when the government transforms a commonly available communications device into a tracking device. The person using cellular telephone number (907) 240-3314 does not knowingly assume the risk that his or her location could be disclosed – no matter when that might be and no matter where that might be.

---

[9] "Big Brother" is a character first introduced in George Orwell's novel, *1984*. The term "Big Brother" is now understood to reference the prospect of total surveillance of citizens by government.

## VI. Conclusion.

Mr. Shine asks that cellular telephone records seized, which the government intends to use to establish his location, be suppressed. He is entitled to this result because the subjective expectation that his cellular telephone would not be transformed by the government into a tracking device is reasonable. Because these records were seized without a warrant, he is entitled to suppression.

DATED this 17th day of April, 2007.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA

/s/ Kevin F. McCoy
Assistant Federal Defender
601 West Fifth Avenue, Suite 800
Anchorage, AK  99501
Ph:  (907) 646-3400
Fax:  (907) 646-3480
kevin_mccoy@fd.org

Certification:

I certify that on April 17, 2007, a copy of the foregoing document, with attachments, was served electronically on:

Frank V. Russo, Esq.
James N. Barkeley , Esq.
Shawn C. Fuller , Esq.
Assistant United States Attorneys

/s/ Kevin F. McCoy